**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 20-12689 JGR |
| UC COLORADO CORPORATION, | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | (Request for Joint Administration Pending) |

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 20-12692 JGR |
| UNITED CANNABIS CORPORATION, | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |

**DEBTORS' RESPONSE TO ORDERS TO SHOW CAUSE**

UC Colorado Corporation ("UC Colorado") and United Cannabis Corporation ("UCANN" and together with UC Colorado, the "Debtors"), debtors-in-possession, by and through counsel Wadsworth Garber Warner Conrardy, P.C., respectfully respond to the Court's Orders to Show Cause, and in support thereof state as follows:

## INTRODUCTION

1. Courts that have weighed in on marijuana-related bankruptcy cases focus their inquiry on whether the debtor will be using marijuana-derived income to fund a plan of reorganization. That inquiry is straightforward in this case. Neither UC Colorado nor UCANN are in the marijuana business. To the contrary, all of the Debtors' current operations relate to, and all revenues are solely derived from, the sale of legal CBD products that are made using CBD that is extracted from legal industrial hemp plants, which was legalized by the 2018 Agricultural Improvement Act, also known as the 2018 Farm Bill. No portion of the Debtors' business violates the Controlled Substances Act, no portion of the Debtors' current or future revenue is, or will be, derived from an illegal activity, and no portion of the Debtors' plans of reorganization will rely in any way on income derived from criminal activity in violation of the Controlled Substances Act.

2. UC Colorado and UCANN are dedicated to the development, production, and distribution of legal industrial hemp-based therapeutics that contain CBD and that are designed to increase the quality of life for patients. Each entity serves a separate and distinct purpose. UC Colorado's sole business purpose is the operation of extraction facilities that convert components of the legal industrial hemp flower into finished CBD products. UC Colorado's extraction, testing and refinement facilities are located in the Denver metropolitan area and in Mead, Colorado. UC Colorado is a wholly owned subsidiary of UCANN.

3. Unlike UC Colorado, UCANN does not engage in operations. UCANN's assets consist of valid and enforceable patents under the patent laws of the United States that claim liquid cannabinoid formulations and licenses relating thereto that do not generate royalties. Additional assets of UCANN include a handful of subsidiaries that are currently not producing revenues, not operational or never have been operational, and shares in a publicly traded Canadian company.

4. Debtors' bankruptcy filings were precipitated by three significant events. First, a dramatic decline in the price of CBD in November 2019. Second, the spread of COVID-19 struck a major blow to the global economy resulting in reduced sales of CBD, industrial hemp and products made from industrial hemp. Third, in the week preceding the Debtors' bankruptcy filings, a creditor, Miner's Delight, LLC, commenced *ex parte* pre-judgment writ of attachment proceedings in the District Court for Jefferson County, Colorado, the execution of which would have resulted in the complete cessation of operations to the detriment of the creditor body and significant, if not complete, loss of jobs.

5. The first two events resulted in significant job losses. Prior to November 2019, UC Colorado had 150 employees. By the end of November 2019, following the crash of CBD prices, it laid off 57 employees, bringing the total number to 93. The ongoing depressed CBD prices and COVID-19 led to further layoffs. UC Colorado currently employs 40 people.

## BACKGROUND

### I. <u>Procedural History</u>

6. On April 20, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors are continuing in possession of their property and are operating and managing their business and affairs as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

7. No trustee, examiner or official committee of unsecured creditors has been appointed in these cases.

8. Both cases were filed on an emergent basis to prevent creditor Miner's Delight, LLC from executing an *ex parte* prejudgment writ of attachment, the execution of which would have resulted in the complete cessation of operations. Due to the emergent nature of the filings, the Debtors' filings were deficient, and the deficiencies had to be cured on or before May 4, 2020. The deficient filings have been timely cured in both cases.

9. On April 22, 2020, the Court entered orders in both cases requiring each of the Debtors and the United States Trustee (the "UST") to show cause in writing on or before May 4, 2020 why their cases should not be dismissed because the Court believes the Debtors may be engaged in the marijuana industry.

10. On April 29, 2020, the Debtors filed Unopposed Motions to Extend Time to Respond to Order to Show Cause (the "Motions to Extend"), requesting a short extension of the

deadline to respond to the Court's Orders to Show Cause to enable them to first focus on curing the deficiencies in their filings.

11. On April 29, 2020, Miner's Delight, LLC, filed a Reservation of Rights with respect to the Motion, but did not oppose the relief sought therein.

12. On April 30, 2020, the Court entered an order granting the Motions to Extend, thereby extending the deadline for the Debtors, the UST, and Ambria Investors LP to file responses to the Orders to Show Cause from May 4, 2020 to May 11, 2020.

## II. Debtors' Operations

### A. Debtors' Revenues and Operations Exclusively Relate to Legal Industrial Hemp

13. The Debtors' primary business is the operation of extraction facilities that convert components of industrial hemp flower into finished cannabidiol ("CBD") products. CBD, the second most prevalent of the active ingredients of cannabis, is derived directly from the hemp plant, which is a cousin of the marijuana plant. Peter Grinspoon, MD, *Cannabidiol (CBD) — what we know and what we don't*, HARVARD HEALTH PUBLISHING, HARVARD MEDICAL SCHOOL, (Aug. 24, 2018, 6:30 AM), https://www.health.harvard.edu/blog/cannabidiol-cbd-what-we-know-and-what-we-dont-2018082414476. The Debtors' products are derived from legal industrial hemp with a delta-9 tetrahydrocannabinol ("THC") concentration of not more than 0.3 percent on a dry weight basis. All of the Debtors' current revenues are derived from the sale of legal CBD products that were made from legal industrial hemp plants.

14. "Botanically, hemp and marijuana are from the same species of the plant, *Cannabis sativa*, but from different varieties or cultivars. However, hemp and marijuana are genetically distinct forms of cannabis that are distinguished by their use and chemical composition as well as by differing cultivation practices in their production." RENÉE JOHNSON, CONG. RESEARCH SERV., R44742, DEFINING *HEMP*: A FACT SHEET 1 (2019). The Debtors do not grow, distribute, sell or knowingly purchase any marijuana plants or products; their business is strictly dedicated to the development, production, and distribution of targeted legal industrial hemp-based therapeutics designed to improve the quality of life for patients that suffer from a number of conditions. The Debtors' hemp-based products include therapeutics to supplement deficiencies related to the endocannabinoid system, including pain, neuropathy, arthritis, MS, IBS, autism, seizures, eczema, sleep, anxiety, head trauma, opioid dependency, and clinical endocannabinoid deficiencies, as well as products that provide targeted and large surface relief with combinations of aromatherapy. The Debtors also develop therapeutics for the management of the negative side effects of chemotherapy, management of rheumatoid arthritis, and treatment of brain cancer.[1]

---

[1] The Debtors are careful to abide by current FDA rules prohibiting product claims. Accordingly, these statements, and similar statements herein, are made solely for the exclusive use of the Court in resolving the Orders to Show Cause.

**B. Debtors' Assets and Corporate Structure**

15. UC Colorado operates a state-of-the-art extraction facility, a testing facility, and a refinement lab, where components of industrial hemp flower are converted into finished CBD products. UC Colorado purchases industrial hemp flower from independent third-party farmers located throughout the continental United States.

16. UCANN has no substantive operations and is similar to a holding company. UCANN is the sole owner of UC Colorado. In addition to its ownership interest in UC Colorado, UCANN also has interests in the following subsidiaries:

a. 95% interest in Prana Therapeutics, Inc. ("Prana"). Prana's primary asset is the therapeutic supplement Epidiferphane. Importantly, Epidiferphane does not contain any cannabis at all–neither extracts from legal industrial hemp nor marijuana. Epidiferphane is a natural therapeutic supplement that consists of a turmeric extract, a tea extract and compounds from cruciferous vegetables. Epidiferphane is used for the management of the negative side effects of chemotherapy, management of rheumatoid arthritis, and treatment of brain cancer. Prana licensed the use of Epidiferphance to NutriMed, LLC and Advesa, Inc. The Advesa, Inc. license agreement was terminated effective January 1, 2019. No revenues are currently being generated from the NutriMed, LLC license. Prana does not currently generate revenues for UCANN.

b. The following subsidiaries either have never conducted business or are inactive:

   i. 100% interest in UCANN California Corporation. UCANN California Corporation has not generated revenue since 2017 and has been inactive since 2019; and

   ii. 100% interest in UC Oregon Corporation and 85% interest in Tennessee Extractions, LLC. Both of these entities were formed to perform hemp extraction in Oregon and Tennessee, respectively. However, neither have ever conducted business.

c. UCANN participates in three joint ventures, the purpose of each is to carry on the business of making CBD distillate and isolate from legal industrial hemp:

   i. Joint venture with Blue Water Green Bridge for extraction of CBD from legal industrial hemp in South Carolina;

   ii. Joint venture with Slainte Operations, LLC for extraction of CBD from legal industrial hemp in Illinois; and

   iii. Joint venture with Silver Point Holdings, LLC for extraction of CBD from legal industrial hemp in Tennessee.

17. Property of UCANN includes US Patent 9,730,911 B2 ("911 Patent"). The 911 Patent is valid and enforceable under the patent laws of the United States, 35 U.S.C. § 1, *et seq.* The 911 Patent claims various liquid cannabinoid formulations that contain the non-psychoactive cannabinoid, CBD, among other cannabinoids. The formulations are useful in alleviating the symptoms of chronic pain, paralysis, neuropathy, Crohn's Disease, IBS, glaucoma, PTSD, anxiety, seizures, epilepsy, autoimmune disorders, autism, tumors and cancer.

18. The 911 Patent is subject to several licenses. All of the licensees are in default for failure to pay royalties. UCANN has not received any royalties since 2017 and will be filing a motion to reject the license agreements pursuant to 11 U.S.C. § 365(a). UCANN currently derives no revenues from the 911 Patent.

19. UCANN owns 87,000 shares of WeedMD, Inc. ("WeedMD"). WeedMD is a Canadian company that produces medical marijuana in compliance with Canada's Cannabis Act. WeedMD is publicly traded over the counter in the United States, ticker OTCMKTS: WDDMF. As of the date of this response, the value of these shares is approximately $25,230.00, which accounts for less than 0.6% of the total value of the Debtors' assets assuming a value of at least $4,000,000. UCANN is a passive investor in WeedMD. It has never participated in operations or received dividends. UCANN's WeedMD shares are not necessary to an effective plan of reorganization because they do not generate any revenue and thus no revenue from these shares will be used to fund the Debtors' plans of reorganization.

## ARGUMENT AND AUTHORITIES

20. The Court's Order to Show Cause finds that "Debtor appears to be engaged in the marijuana industry," which is illegal under federal law. The Court ordered that the Debtor and the UST show cause why this case should not be dismissed, since the Court "cannot be asked to enforce the protections of the Bankruptcy Code in aid of a Debtor whose activities constitute a continuing federal crime." For the reasons discussed below, no cause exists to dismiss these cases because the Debtors are not engaged in business that violates the Controlled Substances Act, 28 U.S.C. § 801, *et seq* (the "CSA").

### I. <u>Evolution of the Definition of Marijuana under The Controlled Substances Act and the De-Criminalization of Hemp</u>

21. The CSA makes it a federal offense, punishable by fines and imprisonment, to manufacture, distribute, or dispense marijuana, or to possess marijuana with the intent to do the same. *See* 21 U.S.C. §§ 812, 841. As enacted, the CSA categorized all forms of cannabis, including marijuana and industrial hemp, as Schedule I drugs, including them in the same category as heroin. *See* 21 U.S.C. § 812. The CSA expressed a Congressional finding that Schedule I substances have a high potential for abuse and no current accepted medical use in treatment in the United States, and that there is a lack of accepted safety for their use under medical supervision. 21 U.S.C. § 812(b)(1).

22. Restrictions on hemp production in the United States were first relaxed as a result

of changes enacted in the Agricultural Act of 2014, P.L. 113-79 ("2014 Farm Bill"). RENÉE JOHNSON, CONG. RESEARCH SERV., R44742, DEFINING *HEMP*: A FACT SHEET 1 (2019). The 2014 Farm Bill provided the original definition of hemp, and defined industrial hemp to mean "the plant Cannabis sativa L. and any part of such plant, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis" *Id.* at 3, n. 5; 7 U.S.C. §5940(b)(2). Delta-9 tetrahydrocannabinol concentration, or delta-9 THC, is marijuana's primary psychoactive chemical. RENÉE JOHNSON, CONG. RESEARCH SERV., R44742, DEFINING *HEMP*: A FACT SHEET 3 (2019). The 2014 Farm Bill's definition of industrial hemp allowed for hemp cultivation "for research purposes by research institutions and state departments of agriculture in states with laws allowing for hemp production." *Id*. at 4.

23. In December 2018, the Agriculture Improvement Act of 2018, P.L. 115-334 ("2018 Farm Bill"), further relaxed restrictions on hemp and expanded on the 2014 Farm Bill's hemp policies. *Id.* at 1, 3-4. The 2018 Farm Bill removed industrial hemp from the CSA's definition of marijuana and removed "tetrahydrocannabinols in hemp" from the definition of tetrahydrocannabinols, which, like marijuana, is classified as a Schedule I drug. 21 U.S.C. § 802(16)(B)(i); 21 U.S.C. §812(c), Schedule I(c)(17). The 2018 Farm Bill amended the 2014 Farm Bill's definition of hemp to mean "the plant Cannabis sativa L. and any part of that plant, *including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers*, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis." 7 U.S.C. § 1639o(1) (emphasis added).

24. "Removing hemp . . . from the CSA—and thus removing it from being considered a controlled substance—effectively permits the cultivation, processing, marketing, and sale of hemp and any cannabinoid derived from hemp that is produced by an authorized grower in accordance with the 2018 farm bill, associated federal USDA regulations, and applicable state regulations." RENÉE JOHNSON, CONG. RESEARCH SERV., R44742, DEFINING *HEMP*: A FACT SHEET 4 (2019).

## II. <u>Cannabis in the Courts</u>

25. Although it remains illegal on the federal level, in recent years, various states have legalized medicinal and recreational marijuana. The growth of the marijuana industry on the state level has led to a corresponding increase in bankruptcy cases at the federal level involving companies and individuals engaged, to varying degrees, in the marijuana industry. As a result, the federal bankruptcy courts have had to consider the breadth of the CSA and to what extent the Bankruptcy Code applies, if at all, to individuals and entities with ties to the marijuana industry. As described by the Honorable Michael E. Romero:

> Whether, and under what circumstances, a federal bankruptcy case may proceed despite connections to the locally "legal" marijuana industry remains on the cutting-edge of federal bankruptcy law. Despite the extensive development of case law, significant gray areas remain. Unfortunately, the courts find themselves in a game of whack-a-mole; each time a case is published, another will arise with a novel issue dressed in a new shade of gray.

*In re Malul*, 2020 WL 1486775, at *1 (Bankr. D. Colo. Mar. 24, 2020).

26. A survey of the limited case law that is available demonstrates that Courts routinely look to whether revenues or assets relating to marijuana will be used to fund the plan or otherwise administer the estate. *In re Rent-Rite Super Kegs West Ltd.*, 484 B.R. 799 (Bankr. D. Colo. 2012) and *In re Arenas*, 514 B.R. 887 (Bankr. D. Colo. 2014) set the stage in this District for which cases are eligible for bankruptcy relief. In *In re Rent-Rite*, the debtor admittedly derived roughly 25% of its revenues from leasing warehouse space to tenants who the debtor knew to be engaged in the business of growing marijuana, in direct violation of the CSA. 484 B.R. at 802. The Court found that the debtor had knowingly and intentionally engaged in conduct violating federal criminal law and did so with respect to its sole income producing asset. *Id.* at 807. The Court further found that "[b]ecause a significant portion of the debtor's income is derived from an illegal activity, § 1129(a)(3) forecloses any possibility of this debtor obtaining confirmation of a plan that relies in any part on income derived from criminal activity." *Id.* at 809. The Court held that the debtor's conduct provided cause to dismiss or convert the case based on gross mismanagement of the estate. *Id.* at 811.

27. In *In re Arenas*, not only did one of the joint debtors lease a unit of his commercial building to a marijuana dispensary, he also cultivated and dispensed marijuana on his own out of the same building. 514 B.R. at 889. The court found that the administration of the chapter 7 case would be "impossible without inextricably involving the Court and the Trustee in [the debtor's] ongoing criminal violations of the CSA." *Id.* at 891. The Court further found that the debtors were not entitled to convert from chapter 7 to chapter 13 because any reorganization would be funded from profits of the debtor's ongoing criminal activity. *Id.* at 892. The Court found cause to dismiss the case based on the debtors' bad faith due to his inability to propose a confirmable chapter 13 plan that did not depend on income from sources that are illegal under the CSA. *Id.* at 894.

28. Numerous other cases have been dismissed due to debtors' strong ties to the marijuana industry. *See In re Way to Grow, Inc.*, 610 B.R. 338 (D. Colo. 2019) (finding cause to dismiss where debtor's primary business consisted of selling supplies to marijuana growers while knowing that the supplies would be used to grow marijuana, and could not propose a confirmable plan that did not rely on knowingly profiting from the marijuana industry); *In re Basrah Custom Design, Inc.*, 600 B.R. 368, 382 (Bankr. E.D. Mich. 2019) (finding cause to dismiss where debtor used the bankruptcy case to set aside his illegal contract to lease his property to a medical marijuana dispensary and where continuation of the case under chapter 7 or chapter 11 "would leave the Court and the parties stuck in the middle of a continuing tug-of-war between two parties with unclean hands"); *In re Burton*, 610 B.R. 633, 639 (9th Cir. BAP 2020) (finding cause to dismiss where, despite debtors' assurances that an entity in which they held a majority interest and which engaged in cultivating and selling marijuana would no longer operate and would not be relied upon to fund their plan, the entity was involved in litigation and the continuation of the bankruptcy case would likely require the trustee or the court to become involved in administering proceeds of that litigation, which was tainted as proceeds of an illegal business).

29. Prior involvement in marijuana is not a bar to obtaining bankruptcy relief. Courts analyze the cases prospectively. In other words, Courts have looked past debtor's prior conduct

and allowed debtors to avail themselves of the protections of the bankruptcy code so long as a plan is not funded with marijuana-derived income. *See In re McGinnis*, 453 B.R. 770 (Bankr. D. Or. 2011); *In re Johnson*, 532 B.R. 53 (Bankr. W.D. Mich. 2015). For example, in *In re Johnson*, the court remarked:

> The Debtor's business is patently incompatible with a bankruptcy proceeding, but his financial circumstances are not. In other words, if the Debtor were not engaged in post-petition criminal activity, there would likely be no controversy about his eligibility for relief under chapter 13. The problem, of course, is that he derives nearly half of his income from activity that Congress forbids as criminal. The Debtor, it seems, must choose between conducting his medical marijuana business and pursuing relief under the Bankruptcy Code. The court has ample authority to require him to make that choice, and given his obvious financial distress, the court concludes that this approach is preferable to dismissal.

532 B.R. at 57-58.

30. The court in *In re Johnson* concluded that debtor filed bankruptcy in good faith to save his home, truck and to prevent termination of his utility services. *Id.* at 59. To allow debtor to avail himself of the protections of the Bankruptcy Code, while simultaneously complying with the CSA, the court ordered the abandonment of the marijuana plants and any products or inventory derived therefrom, explaining that "[e]liminating the contraband from the estate by way of immediate abandonment, and ordering its destruction as a condition of the Debtor's eligibility to proceed further will remove the shadow that the contraband casts on this proceeding, the Standing Trustee, and the court." *Id.* at 59. This was a sensible approach that afforded the debtor his fresh start.

31. While courts have had ample opportunity to consider the bankruptcy eligibility of debtors involved in the *illegal marijuana industry*, few courts have considered the bankruptcy eligibility of debtors, like the Debtors here, that are involved in the *legal hemp industry*. In fact, since the enactment of the 2018 Farm Bill, only two published opinions address the bankruptcy eligibility of a debtor involved at least in part in the legal hemp business: *In re Royalty Properties, LLC*, 604 B.R. 742, 749 (Bankr. N.D. Ill. 2019) and *In re CWNevada, LLC*, 602 B.R. 717 (Bankr. D. Nev. 2019). Neither case is particularly instructive due to dispositive issues that are not present in this case. In *In re Royalty Properties, LLC*, the court acknowledged that hemp and its derivative products are now legal due to the 2018 Farm Bill, but nevertheless found "cause" to convert debtor's chapter 11 case to one under chapter 7 given that debtor had filed for bankruptcy relief not in an attempt to reorganize its existing business, but with the speculative plan of starting an entirely new hemp-growing business despite having no income and no existing business. 604 B.R. at 744, 748-49.

32. In *In re CWNevada, LLC*, the debtor was in the business of cultivating, producing, and distributing medical and recreational marijuana. 602 B.R. at 723. The debtor was also in the business of producing and distributing products that contain CBD used to treat epilepsy. *Id.* The Court held that the portion of the Debtor's operations devoted to the marijuana business appeared to violate the CSA, but the portion devoted to the CBD business might be excluded from the CSA

if the CBD products sold by the debtor are derived from the type of hemp permitted under federal law. *Id.* at 724-25. The court found that the marijuana business operated by the debtor appeared to be the "primary source of the Debtor's revenue" and appeared to be in clear violation of the CSA, and distinguished the facts from cases where the marijuana proceeds would provide merely indirect support for a confirmed plan. *Id.* at 730. Discussing many of the cases cited above, the court found that "[t]he common theme of these voluntary Chapter 11 cases is the bankruptcy court's consideration of whether the debtor in possession could propose a feasible plan that does not rely on income received through a violation of the [CSA]." *Id.* at 733-35. The debtor's direct involvement in the marijuana industry, along with several other factors, provided the basis for the court's determination that dismissal based on abstention under 11 U.S.C. § 305(a) was warranted.

33. This case is easily distinguishable from *In re Royalty Partners, LLC* and *In re CWNevada, LLC*. The facts in *In re Royalty Properties, LLC* are not analogous to the case at hand because, unlike the debtor's speculative hemp-growing business in *In re Royalty Properties, LLC*, in the instant case, Debtors are well established in the hemp and CBD industry and seek to reorganize their existing businesses to continue the same hemp and CBD operations. *In re CWNevada, LLC* is instructive insofar as the court remarked that CBD products that comply with federal law do not violate the CSA; it is otherwise distinguishable because these Debtors have no marijuana-related revenue.

## III. <u>No Cause Exists to Dismiss Debtors' Chapter 11 Cases</u>

34. In stark contrast to the cases discussed above, the Debtors do not grow, distribute, sell or knowingly purchase any marijuana plants or products in violation of the CSA. Rather, the Debtors are engaged in the legal industrial hemp and CBD industry, which was decriminalized as a result of the 2014 and 2018 Farm Bills, and which no longer constitutes a violation of the CSA. All revenues to fund a plan will derive from legal industrial hemp.

35. In fact, Debtors have been able to locate four industrial hemp bankruptcy cases that have not faced, or are not currently facing, dismissals based upon the CSA. *In re Elemental Processing, LLC*, 20-50640 TNW (Bankr. E.D. Ky.) (motion to dismiss pending for mismanagement, lack of adequate protection for use of cash collateral and other reasons not related to CSA, Docket No. 146); *In re GenCanna Global, Inc.*, 20-50133 GRS (Bankr. E.D. Ky.) (no motion to dismiss or order to show cause); *In re Atalo Holdings, Inc.*, 20-50447 GRS (Bankr E.D. Ky.) (no motion to dismiss or order to show cause); *In re William W. Riddle, III*, 20-30026 THF (Bankr. W.D. Ky.) (no motion to dismiss or order to show cause).

36. To the extent that UCANN's ownership of WeedMD shares can be construed as indirectly involving UCANN in the manufacture, distribution, or dispensation of marijuana, such activity is limited to Canada, where it is legal. Moreover, the CSA is domestic in application and is not so expansive as to criminalize UCANN's otherwise legal conduct in Canada. "It is a basic premise of our legal system that, in general, United States law governs domestically but does not rule the world" *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2100 (2016) (internal quotations omitted). "This principle finds expression in a canon of statutory construction known as the presumption against extraterritoriality: Absent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application." *Id.* "When a statute

gives no clear indication of an extraterritorial application, it has none." *Id.* (internal quotations omitted). A review of the relevant authorities does not reveal any indication that the CSA was intended to apply to extraterritorial conduct. Because the CSA does not apply extraterritorially, UCANN's ownership of shares in a Canadian company that engages in activity that is legal in Canada does not violate the CSA.

37. Moreover, the mere presence of this limited connection to the marijuana industry does not prohibit UCANN from obtaining bankruptcy relief. *See In re Burton*, 610 B.R. at 637 (acknowledging that although it remains unclear just how involved a debtor may be in a marijuana-related business and still be permitted to seek relief under the Bankruptcy Code, "[o]ne principle seems implicit in the case law . . . : the mere presence of marijuana does not automatically prohibit a debtor from bankruptcy relief."); *In re Olson*, 2018 WL 989263, *7 (9th Cir. BAP Feb. 5, 2018) ("Although debtors connected to marijuana distribution cannot expect to violate federal law in their bankruptcy case, the mere presence of marijuana near the case should not cause mandatory dismissal.") (Tighe, J. concurring).

38. The WeedMD shares are a *de minimis* component of the Debtors' $4 million bankruptcy estates. As noted above, the current value of UCANN's shares in WeedMD is approximately $25,230.00, which accounts for less than 0.6% of the total value of the Debtors' assets. UCANN does not and will not realize any revenues as a result of its relationship with WeedMD that the Court will be required to administer, and the WeedMD shares will have no impact on the Debtors' ability to propose a confirmable chapter 11 plan, as no portion of Debtors' plans of reorganization will rely, in any way, on income derived from the WeedMD shares. This passive investment in WeedMD will have no impact on the court's ability to administer the Debtors' bankruptcy estates. Similar to *In re Johnson*, where the Court ordered abandonment of the marijuana plants, the Court could order abandonment of the WeedMD shares.

39. While at first blush these cases may appear to be "dressed in a new shade of gray" in the respect that the courts have yet to consider a case with similar facts, the issue here is black and white: the Debtors simply are not involved in the illegal marijuana industry, and unlike the concerns articulated by the courts in *In re Rent-Rite, In re Arenas, et al.*, Debtors will be able to confirm a plan that is funded ***solely*** by revenues derived from the manufacture and sale of legal CBD products extracted from legal industrial hemp.

40. Indeed, the circumstances presented in this case are precisely the type the Bankruptcy Code was designed to address. Both of the Debtors' cases were filed in good faith on an emergent basis to prevent a creditor from executing an *ex parte* pre-judgment writ of attachment, execution of which would have resulted in the complete cessation of operations, the loss of 40 jobs, and a mad-dash race to the courts by creditors to liquidate Debtors' assets resulting in an inherently unequal distribution of assets to Debtors' creditors. This is antithetical to the bankruptcy policies of preserving jobs, consolidating disputes, efficient estate administration, and creditor certainty throughout the plan process.

41. Based on the foregoing, no cause exists to dismiss the Debtors' cases, and any such dismissal would not be in the best interest of the creditors or the estate.

WHEREFORE, the Debtors seek entry of an order from the Court vacating the Orders to Show Cause, and such other and further relief the Court deems necessary.

Dated: May 11, 2020

Respectfully submitted,

WADSWORTH GARBER WARNER CONRARDY, P.C.

*/s/ Aaron J. Conrardy*
Aaron J. Conrardy, #40030
Lindsay S. Riley, Texas Bar #24083799
2580 West Main Street, Suite 200
Littleton, Colorado 80120
(303) 296-1999; (303) 296-7600 (fax)
aconrardy@wgwc-law.com
lriley@wgwc-law.com
Attorneys for the Debtors-in-Possession

**CERTIFICATE OF SERVICE**

I hereby certify that on this the 11th day of May, 2020 I caused the foregoing **DEBTORS' RESPONSE TO ORDER TO SHOW CAUSE**, to be served via United States first-class mail, postage prepaid, or electronically through CM/ECF where indicated, to the following:

UC Colorado Corporation
301 Commercial Road, Unit D
Golden, CO 80401

Alan K. Motes
Alan.Motes@usdoj.gov

Adam L. Hirsch
Adam.hirsch@kutakrock.com

Thomas W. Snyder
Thomas.snyder@kutakrock.com

Mark C. Willis
mark.willis@kutakrock.com

Lance Goff
lance@goff-law.com

John J. Wiest
wiest.john@dorsey.com

Deanna L. Westfall
deanna.westfall@coag.gov

Case Collard
Collard.case@dorsey.com

Kevin S. Neiman
kevin@ksnpc.com

*/s/ Angela Garcia*
Paralegal
For Wadsworth Garber Warner Conrardy, P.C.